### Glascock, et al. v. People's Deposit Bank.

(Decided March 18, 1915.)

#### Appeal from Grant Circuit Court.

1.  Attachment—Liens—Waiver.—A creditor waived his attachment lien on certain property of the debtor by subsequently entering

into and accepting the benefits of a trust agreement with the debtor and other creditors whereby the assets of the debtor including the attached property were placed in the hands of a trustee to be pro rated among the several creditors.

2. Contracts—Debtor and Creditor.—Where the creditors knew the embarrassed condition of the debtor and the nature of his assets, but neither he nor they realized that his embarrassed condition would depreciate the value of his assets, the fact that he placed too much value on certain securities did not amount to such a misrepresentation of the amount of property owned by him as would afford relief against a contract made upon the faith of the estimates.

3. Alteration of Instruments.—Any alteration in a written contract tends to discredit it, and any change is material where the rights or remedies of the other obligors are affected, or where the integrity or the identity of the paper is rendered doubtful, but the mere waiver of a right possessed by one party under the contract is not a ground for complaint by the others under the circumstances of this case.

4. Equity.—Equity will not suffer one to accept the benefits of a contract and escape its burdens.

CLORE, DICKERSON & CLAYTON for appellants.

D. E. CASTLEMAN for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Reversing.

The question in this case is whether the appellee waived or lost its attachment lien by reason of a subsequent contract which it entered into with the debtor and other creditors where it is averred the terms of the contract are inconsistent with the claim of lien under the attachment.

For many years Glascock was a prosperous merchant in Williamstown, Grant County, and owned a great deal of real estate, stocks, bonds and other securities. Among other things, he owned capital stock of the Second National Bank of Cincinnati, of the par value of $25,000, and for which he paid $65,000. In Cincinnati, on February 22nd, 1909, he borrowed from Hutton & Company, of that city, $4,400, and pledged 20 shares of the Second National Bank stock as collateral security. The laws of Ohio permitted, and the note stipulated, that the holder might sell the collateral at his option at public or private sale at any time after default. This note became the property of the appellee, People's Deposit Bank of Burlington, Kentucky. The Second National Bank

afterwards failed and involved other banks in Cincinnati in which Glascock was a stockholder. These failures frightened his creditors, and in the end ruined him financially. On April 19th, 1913, shortly after the Cincinnati failure, the appellee bank sued Glascock on the $4,400 note in the Grant Circuit Court, and procured an order of general attachment on the ground that Glascock was a non-resident. The attachment was levied on Glascock's residence and his three-story brick store house in Williamstown. Glascock then called a meeting of his creditors to be held in Cincinnati; all were notified, and nearly all attended. The appellee was represented at the meeting by its cashier and attorney. Glascock laid before the creditors a detailed written statement showing his assets and liabilities. His assets consisted of farms, town lots, residence and business property, dry goods store, stocks, bonds, notes and accounts, of the estimated value of $318,208. His liabilities amounted to $252,220. Glascock stated that this property was unencumbered, except that certain of the creditors held some of the stocks and bonds as collateral. This was all set forth in the detailed report which he made of everything. He stated that he had not preferred any creditors, and did not intend to, and, if necessary to keep any creditor from gaining a preference, he would go into bankruptcy. To avert this and to prevent a sacrifice sale of his property, he proposed to convey all of it, real and personal, to a trustee for the benefit of his creditors, his wife joining in the conveyance and waiving dower, homestead and statutory exemptions. This conveyance was to include $15,000 life insurance, or rather the wife's benefit in it. The creditors considered and accepted the proposition, and appointed a committee to act with Glascock and his attorneys in the preparation of a trust agreement. The Union Bank and Trust Company of Lexington was selected as trustee, and articles of agreement were prepared and dated May 1st, 1912, containing fourteen sections and as many sub-sections. It covered with detail the whole transaction; the conduct of creditors and the terms of the trust. Separate copies were mailed or delivered to the creditors and all other interested parties for acceptance.

The 13th section provided that the agreement "may be executed by the various parties hereto on different

and separate copies with the same force and effect as if all parties had executed one agreement only.''

The trust was to continue for a year and longer if the creditors thought necessary.

Section 7 related specially to Mrs. Glascock, and is as follows:

''It is hereby agreed, covenanted and stipulated by Bessie J. Glascock, wife of the debtor, and she does hereby assign, transfer, convey and relinquish all and every right, title and interest in and to all the property, real and personal, of said debtor, and particularly all inchoate rights of dower in any and all real estate, the title of which is in the debtor, or held for his use, and agrees to execute any deeds or instruments in writing necessary to convey said interest, to the trustee herein, its successor or assign, and also to convey any right, title or interest she may have in and to all insurance policies upon the life of her husband, for the purpose set forth in this indenture; *provided, however, and upon the condition only that ninety-five per cent. in amount of the creditors of the debtor shall become parties signatory hereto.''*

Glascock and wife and substantially all the creditors —more than 95 per cent. of them—signed each a copy of the agreement, but from the paper signed by Glascock and wife the italicized proviso in Section 7 was erased; that is, the condition that 95 per cent of the creditors should become parties. Mrs. Glascock also wrote and signed at the end of the agreement this statement:

''And the said Bessie J. Glascock for full and sufficient consideration hereby expressly waives that clause of Section 7, as follows: 'Provided, however, and upon the condition only that 95 per cent. in amount of the creditors of the debtor shall become signatory hereto.' ''

After the contract was signed by the various parties, Glascock and wife conveyed without reservation to the trustee all the property, real and personal. The Union Bank accepted the trust and proceeded to administer it for the benefit of the creditors. The trustee sold a large quantity of the real estate, including the Williamstown residence upon which the Burlington Bank had the attachment. It also converted a great deal of the stocks and bonds into cash, and on October 31st it declared and paid a 25 per cent. dividend. The Burlington Bank accepted its share of the dividend, amounting to $937.50.

and credited it on the note in suit.  It should be explained here that this suit was still pending and no steps had been taken in it after the levy of the attachment. Nor was any mention made of it at the creditors' meeting, nor in the trust agreement.  It was explained that, except as to collateral, the trust agreement was to place all creditors on equality.  While appellant did not then expressly waive its attachment lien, yet it signed the trust agreement with full knowledge of its purpose.

Another dividend of 10 per cent. was declared and paid and the Burlington Bank received and credited. $281.25 as its share.  It was stipulated in the trust agreement that the rights of creditors should not be affected as to the collateral held by them, except that they would pay to the trustee for the benefit of all of the creditors any collateral collected in excess of the particular debt which it was pledged to secure.  It was also agreed that no creditor should sell any collateral until the trustee had been given 30 days' notice, and an opportunity to purchase it for the benefit of the estate at the same price which the creditor might be offered for it.

The Burlington Bank sold for $100 the 20 shares of Second National Bank stock which it held as collateral, and credited the proceeds on the note, and admitted that this sale was made in conformity with the terms of the trust agreement.

The other banks in Cincinnati in which Glascock was a stockholder were embarrassed by the failure of the Second National Bank, and, during the summer and fall of 1912, the value of his holdings in them was very materially depreciated, and it became apparent that nothing like the amount Glascock estimated as the value of his estate would be realized by the trustee, and instead of paying in full and leaving a surplus for Glascock, it would not pay more than 50 or 75 per cent.  With knowledge of these conditions, the Burlington Bank showed a disposition to proceed with the attachment.  So, on October 21st, Glascock filed an answer in which the trust agreement was set up in bar of further proceedings, and relied upon as a waiver by the Burlington Bank of any rights under the attachment.  He averred that the Burlington Bank not only signed the trust agreement, but had accepted the benefits of it.  The Burlington Bank replied, admitting it had received the dividend payments, and that the note was entitled to credit to that extent,

but denied that the trust agreement was intended to or could operate as a waiver of the attachment lien. The trustee intervened and in substance set up the Glascock defense and asked the court to discharge the attachment. The court discharged the attachment as to the real estate that had been sold by the trustee—that is, the residence—but sustained it as to the store house, which had not been disposed of. Glascock and the trustee appeal from this judgment.

The bank claims release from the trust contract because of Glascock's alleged misrepresentation as to value of his estate, and because of the alterations made in the contract by Mrs. Glascock. No claim is made that Glascock omitted any of his property from the statement which he exhibited to his creditors, nor that he failed to transfer to the trustee any of his property. No fact is pointed out that he did misrepresent. The argument is that the opinions expressed by Glascock amounted to a misrepresentation of the value of his assets. But we are convinced that his statements in that regard were honest, and were understood by all as matters of opinion. He did estimate his stocks and bonds to be of a stated value, but the creditors and all concerned knew the state of the market. They also knew of his connection with the Second National Bank and the several subsidiary banks. Manifestly, Glascock was too sanguine, and, as is usually the case under circumstances of that kind, the assets of the embarrassed debtor did not pan out. Neither he nor his creditors at the time realized how the fact of his embarrassment would depreciate their value. We do not believe that the mistake of Glascock as to the value of his securities amounted to a misrepresentation of fact. At least, not sufficient to afford relief against a contract made upon the faith of the estimates. Moore v. Turbeville, 2 Bibb, 602, 5 Am. Dec., 642; Marshall v. Peck, 1 Dana, 609; English v. Thomasson, 82 Ky., 280: Head v. Dant, 14 Ky. L. R., 742; Chambers v. Baptist Society, 1 B. Mon., 222; Seng v. Keller, 37 S. W., 581; Pine Mountain Co. v. Ford, 21 Ky. L. R., 142; Elliott on Contracts, Sec. 84.

There are special reasons for denying the right of rescission here because, under the trust agreement, the Burlington Bank not only assumed obligations to Glascock, who made the estimates, but to his wife and all the other creditors against whom no charge of misrepre-

sentation is made. Upon the faith of this contract, Glascock refrained from going into bankruptcy, and the creditors lost their rights to force him into bankruptcy and thus be relieved of the preference which the Burlington Bank obtained by its attachment, and which it is now seeking to enforce.

But the bank argues that after it signed the contract, and without its consent, Mrs. Glascock made a material alteration in it, and that this not only released the bank, but vitiated the contract. This claim has reference to the erasure of the part of clause 7 above referred to, and the written waiver added at the foot of the contract. It will be observed that clause 7 imposed obligations upon Mrs. Glascock and upon her only. She agreed to surrender all of her equities in the property, including life insurance, on one condition, and that was that 95 per cent. of his creditors would agree to the trust. The erasure of the proviso and the added clause amounted to the same thing; that is, she waived the requirement that 95 per cent. of the creditors sign it, and in effect agreed to and did surrender her equities without regard to the number signing it.

The rule is that any alteration in a written obligation tends to discredit it, and the courts have held that any change is material where the rights or remedies of the other obligees are affected, or where the integrity or identity of the paper is rendered doubtful. The rule is a sound one, and in applying it this court has held that a note is not enforcible if after its execution and delivery by one obligor it was signed by another at the instance of the obligee without the knowledge of the first obligor. Shipp's Admr. v. Suggett's Admr., 9 B. Mon., 5; Singleton v. McQuery, 85 Ky., 41; Second Parsons on Notes and Bills, page 559, 2 Cyc., 180.

But, as already noted, this contract was executed by the numerous creditors and parties in interest on separate copies, and each was bound by his particular copy. Therefore, the matter of identity is not so essential or material as in the case of many different parties bound by one writing. When Mrs. Glascock altered the writing which she signed she obligated herself to the trust without regard to the number of creditors entering into it. The writing signed by the Burlington Bank was not altered, but it gave her the right to repudiate the contract on the condition named. If she waived the right and did not

repudiate the contract, the bank has no cause for complaint. Nothing done by Mrs. Glascock changed or prejudiced any right or remedy which the bank had in the contract. There was no change in the number of parties to it, and it could have no effect upon the ratio of contribution or benefits between the obligors. The only effect of the erasure was to give the creditors and each of them more benefits than they had exacted of her. In other words, she waived privileges which they had agreed to give her. To say that this character of alteration by Mrs. Glascock relieved all or any of the other obligors from the effect of the contract, would be to carry the doctrine of alteration to extremes, and make its application absurd. While she agreed to be bound although a less number assented, in fact, more than 95 per cent. did sign. The proviso which she waived was inserted in the contract for her sole benefit. She had a right to waive it at any time, and this waiver could have been made in many ways. It was not necessary to erase it in order to waive it. If less than 95 per cent. had signed she could have waived by a conveyance of her equities notwithstanding. She did not have to obtain the consent of any creditors, for consent of one party is not necessary to a valid waiver of a right possessed by the other party to the contract. .

This record shows that the Burlington Bank, in accordance with the trust agreement, sold and appropriated the collateral held by it; it took the benefit of the release of Mrs. Glascock's dower and insurance; it took and enjoyed the benefit of the services of the trustee; it accepted two dividends from the trust estate, and these dividends were in part made up of the proceeds of the sale of some of the attached real estate; it suffered the real estate to be sold without protest or complaint. When the Burlington Bank entered into the agreement Glascock and his creditors refrained from taking steps to nullify the preference which the bank had theretofore obtained by reason of its attachment. After the time has passed in which the preference may be nullified, the bank should not be permitted to assert the preference. Equity will not suffer one to accept the benefits of a contract and escape its burdens. But that is appellee's attitude in this case. We are of opinion that the judgment of the lower court is erroneous, and it is, therefore, reversed, with directions to discharge the attachment.